UNITED STATES v. 3.71 ACRES OF LAND, MORE OR LESS, IN BOROUGH OF QUEENS, LONG ISLAND CITY, N. Y., et al.

No. 664.

District Court, E. D. New York.

May 17, 1943.

Harry T. Dolan, Sp. Asst. to Atty. Gen. of United States, for petitioner-plaintiff.

Conboy, Hewitt, O'Brien & Boardman, of New York City (Martin Conboy and James T. Tynion, both of New York City, of counsel), for defendant William Bradley & Son, Inc.

CAMPBELL, District Judge.

This case comes before this court at this time solely for the purpose of the determination of the award to be made for the fee simple of lands, and the improvements thereon to which the petitioner-plaintiff acquired title under a declaration of taking filed April 10, 1942, pursuant to Title 40, Section 258a, U.S.C.A.

The property so acquired was well located with reference to highways, being on the Vernon Boulevard, the main highway leading from Astoria to Newtown Creek, near the non-toll Queensboro Bridge, within easy trucking distance of the Queens Midtown Tunnel, the Triboro Bridge, the Bronx-Whitestone Bridge, and the Meeker Avenue and Greenpoint Bridges, leading into all parts of Brooklyn.

It is near Queens Boulevard, Northern Boulevard and Grand Central Parkway, and but a comparatively short distance from the Long Island Railroad, which has connections all over the United States.

It also had water transportation facilities, but that was limited to boats of comparatively light draught.

It consisted of a tract of land, having an area of approximately 164,200 square feet, extending from the westerly side of Vernon Boulevard, to the East River, at the foot of 40th Street, being 260.22 feet in width on Vernon Boulevard; 259.35 feet in width on the East River, and 631.74 feet in depth from Vernon Boulevard to the East River on the northerly side of the subject property, and 615.78 feet on the southerly side of said property, on which there was located a one-story frame and composition factory building with a bulkhead along the river front, and a three-story brick and limestone office building.

The buildings were constructed in 1906–1907 and were specially designed to meet the requirements of use in the marble industry, which at that time was a flourishing industry along the water front in that neighborhood, and there were also a number of other marble establishments in the vicinity. With the lapse of time many of the marble industries in that neighborhood had gone out of business, or were in the process of liquidation at the time of the taking by petitioner-plaintiff, and most of those properties were on the market for sale.

In fact, the subject property had, within a few months prior to its taking by the petitioner-plaintiff, been leased for the term of ten years, at a minimum annual rental of $27,000, the possible rent over that figure being more or less speculative.

The channel of the East River, east of Blackwell's Island, on which the subject property is located, is known as the East Channel, and at that point is generally suitable only for water transportation by barges, scows, lighters, and tugs, and not by deep draught vessels, such as large steamships, due to the shallow depth of water, at mean low water.

The depth of water at the bulkhead line of the subject property at mean low water is 8 to 11.5 feet, and generally for 160 feet out west of the bulkhead it is from 12 to 15 feet.

On behalf of the defendant, its real estate expert Mr. Morrissey testified that the 164,200 square feet of land, including the bulkhead, was of the value of $1.25 a square foot, that is, $205,250; and its real estate expert Mr. Hosinger testified that it was of the value, including the bulkhead, of $1.30 a square foot, which he made $213,500.

An analysis of all of the sales of property, the details of which were given on the trial, and which need not be separately described here, do not justify any such value, but the same is based solely on the opinion of such witnesses, as opposed to what is shown by the actual sales, which to me have greater weight.

Mr. Potter, a real estate expert, called on behalf of the petitioner-plaintiff, testified to a value of 75 cents a square foot for the land, including the bulkhead, which he made a total of $125,000; and Mr. Schlichta, another real estate expert, called on behalf of the petitioner-plaintiff, likewise testified to a value of 75 cents a square foot, for the land, including the bulkhead, but made the total $123,000.

It seems to me that a somewhat higher valuation for the land, including the bulkhead, than that placed upon it by the petitioner-plaintiff's expert witnesses, but much lower than the value placed upon it by defendant's expert witnesses represents the real value of the land, including the bulkhead, at the time of taking, and that is, 90 cents a square foot for 164,200 square feet, amounting to $147,780.

This brings us to a consideration of the value of the improvements.

■ In my opinion the value of the improvements is what they add to the value of the land.

Of course, the cost of reproduction new, less depreciation, should be considered as a guide, but its weight is dependent upon what the court finds as to cost of reproduction, and depreciation, and there is a conflict in the evidence on those points.

Defendant relies strongly, however, upon the testimony of its building expert Mr. Kennedy, who based his opinion on his estimated cost of reproduction with new material, which for the factory building he placed at $382,548, less physical depreciation of $43,184, leaving a sound value of $339,364.

That would mean a physical depreciation of between 11 and 12 percent in a building 35 years old.

Experience teaches us that such a depreciation would be much too low for physical depreciation, not counting functional depreciation, obsolescence, which must exist in a building of that size and age. It is further to be observed that the conditions under which these· estimates were made, were not those of the date of taking by the petitioner-plaintiff.

I am convinced that the building was in many respects not in good condition when taken over by the petitioner-plaintiff, as I shall later point out herein, and I can not accept that appraisal as representing the value of the building at the time of taking.

That is likewise true of the office building, the cost of reproduction new, of which that witness places at $50,716 and depreciated only about 10 per cent, that is, $5,214, leaving what he contends was the sound value at the time of taking by petitioner-plaintiff, $45,502.

Not only is the allowance for the depreciation far below what experience teaches us, but, in addition, the building was in effect a show building, and it is hard to believe that any one would reproduce such building.

The value of the bulkhead, replaced by new material, is estimated by that witness at $51,308, less a physical depreciation of only $764, leaving a sound value at the time of taking $50,544. This is clearly erroneous, as the condition of the bulkhead at the time of taking was clearly described, showing a giving outward of the bulkhead, requiring extensive repairs, and the depreciation of that bulkhead was clearly 50 per cent. In addition, it was the fact that the bulkhead was built in a crib, and could only be repaired as a crib bulkhead, and not as a more modern bulkhead. The cost of reproduction new, as estimated by that witness, was too high.

In considering the so-called factory building, we must not lose sight of the fact that the later built buildings for like purposes are of steel frame construction, whereas the factory building on the subject property is a frame and composition structure.

There is a wide ,variance in the testimony of the defendant's experts, as to the sound value of the improvements, Mr. Kennedy placing them, consisting of the factory building and office building, at $384,866; Mr. Morrissey at $294,750, and Mr. Hosinger at $311,500. Both Mr. Morrissey and Mr. Hosinger excluded the bulkhead from the improvements, and included it in the value of the land.

I viewed this property on March 13, 1943, which was long after the taking, and after work had been done thereon by the agents, servants and employees of the petitioner-plaintiff.

A new derrick had been erected by it, but that derrick did not, in any way, affect the damaged condition of the bulkhead, as it did not depend on that bulkhead for its support, but was built on its own foundation.

Even if the damaged condition of the bulkhead may have increased by use since the taking, that does not enter into my calculation, as I am considering its condition solely as of the date of taking.

I have carefully considered the evidence, oral and by way of photographs offered on behalf of the defendant, as to the condition of the buildings and bulkhead on said land, at the time of taking, and believe that such witnesses were honestly in error, but I am impressed by the testimony of the witness Kohler, called on behalf of the

petitioner-plaintiff, as to the condition of the improvements when taken by petitioner-plaintiff, as I believe he had the best opportunity for observation, and testified as to the condition at the actual time of taking.

Mr. Kohler was a civilian employee of the United States Navy. He went into the subject property in March, 1942, and had remained there until the time of this hearing. His duty was to keep it in shape so that they could manufacture, and during that time he had supervised and been in charge of installation of necessary work to have the property in shape for industrial use. He inspected the various parts of the buildings for the purpose of making repairs or changes in the physical structures. He testified as to the conditions at the time of the taking of the roof, drainage system, the window sashes and panes of glass, the floor, columns and supports, heating plant, troughs in the bays, wells and pipes, and crane rails in the factory building; the bulkhead sometimes called the dock, and the roof and basement in the office or administration building. The conditions at the time of taking were further shown by the photographs. Exhibits 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18 and 19.

Both such oral and documentary evidence show that the buildings and bulkhead were not in good condition in the respects cited by Mr. Kohler at the time of the taking.

I was likewise impressed by the testimony of the witness Boes, whose appraisal was based on his own investigation, and measurements, and not that of others.

I believe that his estimate of cost of reproduction of the factory building, less a total depreciation of 40 per cent, and not the higher one estimated by him due to the repairs and new matter such as for instance the sprinkler system closely approaches what that building adds to the value of the land. As to the office building the cost of reproduction new, as stated by him, is not very impressive, as no one would want to replace it with an ornate building such as it was at time of taking, and it certainly, because of obsolescense, does not add much more than 40 per cent of such cost of reproduction new to the value of the land. The defendant makes a point of the money spent on the factory building for repairs, and new installations, within a comparatively short time before the taking, including the sprinkler system, but the fact is that the money so spent added but little to the value of the land and building, due to the physical conditions, especially the great height of the sprinkler system, but the repairs made of course tend to reduce the depreciation.

As I have hereinbefore said, reproduction cost new, less physical depreciation, is not the real test of value, but the real test is, what the improvements added to the value of the land, and using Boes' figures, we come close to what I believe the buildings, including the bulkhead, added to the value of the land at the time of taking.

Of course the owner is entitled to be compensated on the basis of all uses for which the property is adaptable, in this case however it seems to me that the uses for which the subject property is most adaptable, is for storage, a repair shop, or a factory.

It is the duty of this court to see that the owner receives the full value of the property taken, but, at the same time, it is the duty of this court to protect the government and the taxpayers against an award that is higher than the real value of the property taken.

None of the real estate experts, called on behalf of either party, has given any separate figure of the value of the bulkhead, but has included it in the value of the land, which I consider proper, and I have likewise included the value of the bulkhead in the value of the land, as the value of the bulkhead is reflected in the value of the land. The valuations of the factory building and the office building by defendant's experts are too high, and the valuations by the petitioner-plaintiff's witnesses are too low.

I find, as the fair market value of the land in question, and the sound value of the improvements thereon on April 10, 1942, the day of the taking, to be $297,780, made up as follows:

Land 164,200 square feet, including bulkhead at 90 cents a square foot .............. $147,780.00

Improvements
Factory building ............ 135,000.00
Office building ..:........... 15,000.00

$297,780.00

Settle decree on notice.