## UNITED STATES v. CERTAIN LANDS IN TOWN OF WAPPINGER, DUTCHESS COUNTY, N. Y., et al.

District Court, S. D. New York.
June 27, 1946.

906

Harry T. Dolan, Sp. Asst. to Atty. Gen., for petitioner-plaintiff.

William A. Mulvey, of Poughkeepsie, N. Y., for defendants Nathan Newman et al.

BRIGHT, District Judge.

This proceeding was originally begun on August 29, 1942, by the filing of a petition to acquire by condemnation, for the construction of the New Hackensack Auxiliary landing field, certain fee interests in the lands of the defendants Nathan Newman, Samuel S. Newman and R. Adele Steinhardt, east of the State Route 376, also known as the New Hackensack Road, in the Town of Wappinger, Dutchess County, New York, and also in a gravel bank on the west side of that road, together with an easement over and across sixteen acres of other lands of the defendant Nathan Newman, on the west side of the road, and in the air space over that land for use as a clearance zone for the approaches to the runways of the airfield. An order for immediate possession of the property and easement to be condemned was entered on the same day. On August 20, 1943, there was filed a declaration of taking of the fee in all of the lands of the three named defendants, 181.70 acres belonging to the defendant Nathan Newman, situated on both sides of the road and designated as Parcel 6, and 18.30 acres, designated as Parcel 7, belonging to the defendants Samuel S. Newman and R. Adele Steinhardt, situated on the west side of the road and adjoining Parcel 6 on the south. A judgment of taking of the land mentioned, together with all buildings and improvements thereon, was filed on the same day, which vested in the plaintiff the fee simple title of Parcels 6 and 7 mentioned, upon the deposit in the registry of the court of the sum of $46,600. The petition was thereafter amended accordingly.

The property in question fronts on both sides of the state road. Parcel 6 has a frontage of about 1848 feet on the westerly side, and 2180 feet on the easterly side. Parcel 7 has a frontage of about 1320 feet on the westerly side of the state road. The entire property was acquired by the defendant Nathan Newman, on May 3, 1928, at a cost of about $55,000, and was in good condition when purchased, and has since then been modernized. In August, 1941, a large dairy barn on the west side of the highway burned, and Mr. Newman received about $15,000 insurance for its loss. On June 18, 1941, he leased Parcel 7, consisting of 18.3 acres, to the Civil Aeronautics authority of the Government, from July 1, 1941, to June 3, 1942, at $750 per annum, with the right of renewal from year to year until June 30, 1951, upon thirty days notice in each year. The lease gave the lessee the right to cut and trim trees on adjoining lands, within a distance of 200 feet from the boundaries of the land leased, and any and all trees on the easterly side of the state highway within 40 feet of the center line, after April 1, 1942. On October 14, 1941, this leased portion was conveyed by Mr. Newman to his two children, the defendants Samuel S. Newman and R. Adele Steinhardt. The balance of the property, consisting of 181.70 acres, is Parcel 6.

The residence and other buildings belonging to the defendant Nathan Newman were all located on Parcel 6, east of the New Hackensack Road. The present air field was located and now exists on the west side of the road, and includes not only the Newman property but the property of some ten or more other owners. At the time of the trial, all of the buildings had been razed, and they had been at the time I viewed the property.

The main portion of the residence is of brick construction and is said to have been built in 1772. It consists of nineteen rooms, and is heated by a hot water system. It was for many years occupied by the owner as a home, and his daughter, a Miss Newman, also lived there. Mr. Newman is now living in Florida, where he has been for the past two years confined to his bed. After its acquisition, a frame portion was added. It has a slate roof, and is surrounded by beautiful trees, shrubbery and lawns. There are four fireplaces on the first floor and two bathrooms, and on the second floor there are twelve bedrooms and four bathrooms with showers. The water system

consists of two reservoirs, a large one on the top of a hill on the northeastern part of the property from whence the water is conducted to the residence by gravity. An artesian well feeds this reservoir. There is another reservoir used for fire protection purposes, which is supplied by a spring and brook, and there is also a cistern in the house in which is collected rain water for laundry purposes. In addition to this fine house, there is also located on the property ten other structures, consisting of a horse barn, a tool shed and barn connected with it, two additional barns, shed, concrete block garage for two cars, corn crib, smoke house, hen house, another small cottage, and a tenant house. The tenant house is situated about one-quarter of a mile along the state road from the main residence, and is wired for electricity and supplied with water and steam heat. The pictures exhibited to me show a beautiful country farm estate, with fine trees and picturesque landscape.

Parcel 6 is bounded on the northerly side by Wappingers Creek, a fine stream, along which there is a frontage of about 2300 feet and in which, within the bounds of the property, is located an island. The farm portion of the property had been leased out until March 1942. Mr. Newman had operated the farm for a year or two before the barn burned down. Since then the property has been used for pasture by others.

It was testified to by one of the witnesses for the plaintiff that on March 16, 1942, after the dairy barn had been destroyed by fire, the defendant Nathan Newman had listed the property with the witness for sale, and the witness had shown it to prospective purchasers. A memorandum of that listing was introduced in evidence, and the price, including some equipment, was fixed at $50,000, $15,000 of which was to be paid in cash and the balance by mortgage. The owner was also willing to rent the property for $3,000 yearly. It was also testified to by one of the witnesses for the defendants that he, too, had an oral listing by Mr. Newman for sale, from 1935 on at $135,000; he never had any listing for less than $100,000; and that Mr. Newman

had asked him to get his taxes reduced some time before he leased to the Government in 1941. The assessed value of the 204 acres was $13,000 for the land, and the total assessment was $24,000. The equalization rate in the town was 70%. Neither of these broker witnesses had been able to procure a purchaser, although the property had been advertised and shown to prospective buyers.

There was considerable dispute as to the highest available use to which the property could be put. For the defendants, Mr. Thew testified that the property was adaptable to development at any time; that the airport as it existed in 1943 added to its value, and, if developed from its private aspect, would have to take in the property in question. Mr. Bannister, on the other hand, stated that its best available use would be the use to which it was being put in August 1943, as a small landing field, and probably its highest available use was in conjunction with the airfield; the buildings upon the property did not enhance its value; for the use to which he thought it was adapted, the buildings would be of no value and would have to be torn down. For the plaintiff, both witnesses testified that the highest available use was an estate farm, that the presence of the small airfield was a detriment, and that it had insufficient buildings for a profitable farm operation.

There was also dispute as to the trend of market values in the years shortly before and after the date of taking. There was no dispute, however, that at the time of the purchase of the farm, we were in the boom period of prices just before the 1929 collapse. Mr. Thew, for the defendants, testified that the prices of real estate in 1945 exceeded those of 1929, before the stock crash; that the prices in 1943 and 1945 averaged out the same; that between 1940 and 1945, prices were rising not to exceed 10% in all, and that between 1942 and 1944, the increase was maybe 2%; that the market value in 1942 and 1943 was about the same, and about 1% more by the end of 1944, and another 1% more by V-J Day in 1945. Mr. Yates, for the plaintiff, however, testified that the market value for

farms in 1945 had not reached a comparable basis of either demand or price as in 1928 and 1929; that the demand for property of this type during 1943 was not quite as active, and the prices not near as good as during 1945; that the advance had started to be felt in 1944. In 1940 and 1941, there was not an intense demand for small houses; that demand has been from 1944 to 1945. Mr. Guernsey stated that the market price of a comparable piece of property was about the same between 1942 and 1943, that there was a slight increase in the latter part of 1944 and 1945 the prices were considerably higher than in 1943. The demand was greater in 1944 and 1945.

As usual, the values testified to by the experts called by each side cannot be reconciled. They may be tabulated as follows:

"It may be more or less than the owner's investment. He may have acquired the property for less than its worth or he may have paid a speculative and exorbitant price. Its value may have changed substantially while held by him. The return yielded may have been greater or less than interest, taxes, and other carrying charges. The public may not by any means confiscate the benefits, or be required to bear the burden, of the owner's bargain. * * */ He is entitled to be put in as good a position pecuniarily as if his property had not been taken. He must be made whole but is not entitled to more. * * * Just compensation includes all elements of value that inhere in the property, but it does not exceed market value fairly determined. The sum required to be paid the owner does not de-

| Witness | Land Value 181.7A | 18.3A | Reproduction Cost of Buildings less Depreciation | Enhancement by Buildings | Total Market Value Parcel 6 | Parcel 7 |
|---|---|---|---|---|---|---|
| Defendants' | | | | | | |
| Bowman | | | 46,397.90 | | | |
| Thew | 58,500. | 9,000 | 40,800. | | 99,300. | 9,000. |
| Bannister | 90,000. | 10,800 | 0 | 0 | 90,000. | 10,800. |
| Plaintiff's | | | | | | |
| Yates | 13,650. | 1,800 | | 21,350. | 35,000. | 1,800. |
| Guernsey | 14,536 | 1,464 | | | 36,000. | 2,000. |

The question now litigated is the amount to which the three named defendants are entitled as just compensation for the taking. It has been stipulated that the value is to be established as of August 20, 1943, but that interest is to be added to the award from August 29, 1942.

■ The standards of value which are to prevail in the determination of any award seem to be well settled. In Olson v. United States, 292 U.S. 246–254, 54 S.Ct. 704, 708, 78 L.Ed. 1236, it was written that no private property shall be appropriated to public uses unless a full and exact equivalent for it be returned to the owner, that equivalent being the market value of the property at the time of the taking contemporaneously paid in money.

pend upon the uses to which he has devoted his land but is to be arrived at upon just consideration of all the uses for which it is suitable. The highest and most profitable use for which the property is adaptable and needed or likely to be needed in the reasonably near future is to be considered, not necessarily as the measure of value, but to the full extent that the prospect of demand for such use affects the market value while the property is privately held."

In United States v. Miller, 317 U.S. 369–373, 63 S.Ct. 276, 280, 87 L.Ed. 336, 147 A.L.R. 55, Mr. Justice Roberts wrote:

"It is conceivable that an owner's indemnity should be measured in various ways depending upon the circumstances of each

case and that no general formula should be used for the purpose. In an effort, however, to find some practical standard, the courts early adopted, and have retained, the concept of market value. \* \* \* Since the owner is to receive no more than indemnity for his loss, his award cannot be enhanced by any gain to the taker. Thus, although the market value of the property is to be fixed with due consideration of all its available uses, its special value to the condemnor as distinguished from others who may or may not possess the power to condemn, must be excluded as an element of market value. \* \* \* We need not determine what is the local law, for the federal statutes upon which reliance is placed require only that, in condemnation proceedings, a federal court shall adopt the forms and methods of procedure afforded by the law of the State in which the court sits. They do not, and could not, affect questions of substantive right,—such as the measure of compensation,—grounded upon the Constitution of the United States."

■■■ The burden of establishing the value of the lands sought to be condemned is on the defendants. The value may be determined in the light of the special or higher use of the land when combined with other parcels; but before any weight for that special adaptability is to be considered, there must be a reasonable probability of the lands in question being combined with other tracts for that purpose in the reasonably near future. In the absence of such a showing, the chances of their being so united is regarded as too remote and speculative to have any legitimate effect upon the valuation. United States ex rel. T.V.A. v. Powelson, 319 U.S. 266-273-275, 276, 63 S.Ct. 1047, 87 L.Ed. 1390. Of course, the possibility of such connection must be reasonably sufficient to affect the market value. McCandless v. United States, 298 U.S. 342-345, 56 S.Ct. 764, 80 L.Ed. 1205; Continental Land Co. v. United States, 9 Cir., 88 F.2d 104-111, certiorari denied 302 U.S. 715, 58 S.Ct. 36, 82 L.Ed. 552.

■■■ To warrant the admission of testimony as to value for purposes other than for which the land is actually used, regard must be had for the existing conditions and wants of the community, or such as may be reasonably anticipated in the immediate future. United States v. Foster, 8 Cir., 131 F.2d 3-5, certiorari denied 318 U.S. 767, 63 S.Ct. 760, 87 L.Ed. 1138.

■■■ It may be that in some cases separate testimony as to the structural value of improvements upon a piece of real property would be admissible; but where the property has a market value, as it is evident this one did, that is the value that would control. The real inquiry would then be, to what extent the improvements enhance the value of the land. Devou v. City of Cincinnati, 6 Cir., 162 F. 633, certiorari denied 212 U.S. 577, 29 S.Ct. 685, 53 L.Ed. 658; Fain v. United States, 6 Cir., 145 F.2d 956-958; United States v. Becktold Co., 129 F.2d 473-477; United States v. Certain lands Located in Town of Hempstead, D. C., 43 F.Supp. 418-423; United States v. 3.71 Acres, D.C., 50 F.Supp. 110-112.

■■■ It is true that where condemned land is particularly adapted for an airfield, not only in its surface but because of its location, that increment must be paid for; but that factor would be relevant only insofar as it was proved that the organization using the private airfield was likely to expand before the Government intervened. Absent such proof, it is doubtful that there is any available argument based upon the element of adaptability, because it is clear that any increase occasioned by the demands of the Government cannot enter into an award—no owner can profit by exacting anything from the condemnor for the value of any use which condemnation will bring to him. United States v. Lambert, 2 Cir., 146 F.2d 469-472.

This was a fine country estate, and has never been used otherwise, except for the 18 acres leased as a private airport since 1941. The destruction of the barn in that year destroyed some of the value of the property as a farm. When taken by the Government, however, it had not changed its nature. The lease as an airport was at best but a temporary one, and could be terminated at the end of any year. Even if it

may be assumed that the war was then imminent, there could be no assurance that the property would be developed into a large auxiliary airport for war purposes, nor for how long it could continue to exist as such if it were. There was apparently no demand for a large airport at the time. Certainly, there is no evidence of such a demand. There is also no proof that the prospect of any such demand affected the value of property in that vicinity. Lacking also is other proof of a reasonable probability of the lands in question being combined with other tracts in the near future for such an airport as now exists.

As I have stated above, the burden is upon defendants to establish the value of the lands sought to be condemned. Their theories, however, conflict. One of their witnesses testified to the sound value of the buildings as a criterion of their worth; another that in his opinion the property was available as a development with the small airport along side of it adding to its value; and the third, that its value is solely as an airport and the buildings added nothing.

It has been my experience that residential properties are never sold on the basis of land value plus reproduction cost of buildings less depreciation. The price is arrived at as a whole, and in large properties of this character, with expensive and elaborate buildings, the problem is more of a dicker, the owner desirous of disposing, getting as much as he can, and the buyer, having in mind changes to suit his individual taste, seeking the low dollar. The cost of the buildings has little to do with the ultimate deal, and the history of large estates over the past fifteen years seems to prove that. In fact, large properties between 1929 and 1944 were very difficult to dispose of at all. The buildings on many were torn down, and others were given to municipalities or governments, to save taxes. People did not want large properties; they could not afford to keep or operate them, and there was a scarcity of adequate help. And the theory of sound value is entirely at variance with its value as an airport.

If the question is approached from the angle of real estate development, it seems obvious to me that the presence of an airport, with all of its noise engendered by the arriving and leaving of planes, coupled with the hazard, which might be considered present, or crashing planes, would prevent buyers from locating too close to it. And for the same reason, the prospective buyer of this property as a county estate, would not desire an annoyance so close to his residence. The existence of so many other developments, some much nearer Poughkeepsie than this property, would also seem to detract from its value as such. And, finally, the value of this property as a development, does not seem to have received much emphasis from defendants' witnesses.

My conception of the value inherent in this property arises from its proximity to Poughkeepsie, with its facilities for shopping, transportation, education and other conveniences, coupled with the fine old building and other structures upon it. There is no doubt in my mind that the coming of the I.B.M. in 1941 has added some increment to that value. The buildings upon the property have also, to the extent that they enhance the value of the land. They seem to me to be appropriate to it.

It would increase the length of this opinion, already too extensive, were I to attempt an analysis of the sales of properties claimed to be comparable. It is extremely difficult to rationalize prices from alleged comparable sales. Every piece of real estate is an entity like only unto itself. Conditions of locality, road frontage, available water supply, soil, kind, size and character of buildings, and many other characteristics, vary so greatly as to make impossible any satisfactory comparison. There is always the intangible like or dislike of the purchaser his desire to remodel to suit himself, as well as the knowledge of what confronts the seller at the particular time by way of financial difficulty, liquidation, death, marriage and many other things, which add so much more to the problem of comparison of values.

This taking comes at a time when real estate values were commencing to feel the impact of the war, and had commenced to rise. Housing shortage and the demand for homes did not become acute until 1945, when it was obvious that building materials were becoming less and less available, that the war was about won, and the returning veterans with their new wives, and those who had worked at war work and accumulated considerable savings, would demand homes of their own. My personal judgment and experience leads me to find that in August 1943, real estate had not advanced to the extent that the valuations shown in the sales of 1944 and 1945 evidence. And whatever that advance, the demand was for small homes. It is axiomatic that as the price increased, the market became that much narrower.

It may not be amiss, before closing, to notice the disparity in land values among the witnesses. Mr. Thew places a value of $300 per acre on tract 6, and $486 on tract 7. Mr. Bannister values tract 6 at $497 an acre, and tract 7 at $600. Mr. Yates appraised tract 6 at $75 an acre, and tract 7, because it was smaller, at $100. Mr. Guernsey valued tract 6 at $80 per acre and tract 7 at $111, stating also generally that the value of farm land in Dutchess County varied from $60 to $100 per acre.

With these widely divergent views, I am to try to compensate these defendants for the loss of their property. Exercising whatever judgment I may have, both from the evidence and my experience in real estate and similar cases, I make the following awards:

To the defendant Nathan Newman for tract 6, 181.70 acres:

| | |
|---|---|
| Land at $125. per acre | $22,712.50 |
| Enhanced by the improvements to the extent of | 30,000.00 |
| Total | $52,712.50 |

And to the defendants Samuel S. Newman and R. Adele Steinhardt for tract 7, 18.3 acres at $125. per acre $2,287.50.

The final order will be settled on notice.