## UNITED STATES v. CERTAIN LAND IN ORANGETOWN TP., ROCKLAND COUNTY, N. Y., et al.

District Court, S. D. New York.

Jan. 14, 1947.

816

Harry T. Dolan, Sp. Asst. to Atty. Gen. (John A. Jordan, Sp. Atty., Department of Justice, of Brooklyn, N. Y., of counsel), for petitioner-plaintiff.

Charles Fishberg, of Englewood, N. J., for defendants Hans C. Brugger and Irene Brugger.

BRIGHT, District Judge.

The Government has condemned two parcels of improved real estate in the Town of Orangeburg, Rockland County, New York, designated as A–57 and A–43, for use as a part of Camp Shanks. Plaintiff took possession of them on March 9, 1943, under a declaration of taking, upon which judgment was then entered.

### Parcel A–57.

The purported owner of this was the defendant Hans C. Brugger. It contained .59 of an acre and was not situated upon any public highway. The description begins at a point 200 feet southeasterly from the Orangeburg-Tappan Road, and delineates a quadrangle, 102.18 feet on the north side, 248.8 feet in depth on the east side, 100 feet along the rear, and 257.17 feet on the west. The entrance to the property was over an unfinished dirt lane, along which there was no sidewalk. Upon the tract were located three buildings, photographs of which were submitted upon the hearing, and, prior to plaintiff's taking possession, were all occupied by tenants. At the time I inspected the property, all of the buildings had been razed.

One of these buildings, designated as 4–A, was a two story frame dwelling with seven rooms and basement, bath, hall, with concrete foundations, a pipeless furnace, old style plumbing, and a composition roof. It was rented at $30 a month, and was valued by the expert called for the owner at $4,200, of which $500 was for the land, 50x157, and $3,700 for improvements. This last figure was arrived at by cubing the building at 25¢ per cubic foot, which gave a reproduction cost of $4,306 from which was deducted $646 for depreciation. The structure is said to have been close to what was projected as McKay Terrace.

The building 4–B was said to be on the north side of Washington Avenue, which was merely projected and not actually improved. The home was a one story stucco bungalow of four rooms and a bath, with concrete foundation, pipeless hot air furnace, old style plumbing, and a shingle roof. It was rented at $25 a month. Defendant's expert placed a market value of $2,700 upon it, $500 for land, 50x107; and the balance for the building, cubed at 25¢ per cubic foot, gave a reproduction cost of $2,587, from which was deducted $388 for depreciation. This building is said to have been located 40 or 50 feet easterly of 4–A.

The third dwelling, 4–C, was located upon a plot 100x100. It was a very small four-room and bath bungalow with no cellar, and was constructed of concrete blocks. Its steam plant was located in the rear. Defendant's expert placed a market value upon it of $2,245, of which $500 was for the land. He cubed the contents of the building at 23¢ a foot, aggregating $2,053, from which he deducted $308, for depreciation, leaving a net of $1,745. The building was rented for $25 a month; was said to have been located on the rear part of the tract about 200 feet north of 4–A and 4–B; and between 4–A and 4–B there was a dirt driveway going back to 4–C.

The owner had purchased the entire property for $2,500 on June 20, 1942, the buildings then being in an unfinished state, and had thereafter improved the three dwellings, spending between $1,400 and $1,900 for that purpose, so that they could be rented.

Defendant's witness thus placed a total value upon parcel A–57 of $9,145, of which $1,500 was for the land (nearly $3,000 per acre) and $7645 for the building. He stated upon his cross-examination that he arrived at this in two ways, one by reproduction cost less depreciation, and the other by capitalizing the rental value. He did not take into consideration any sales in the neighborhood, finding, so he says, none comparable, nor was he influenced by the assessment value placed upon the property. He used the same rate of physical depreciation—15%—as to each of the buildings, considering them to be each approximately fifteen years old.

Plaintiff's expert stated that, in his opinion, the fair market value of Parcel A–57 was $5,000. He was not cross-examined.

He submitted a list of ten sales of properties in the immediate vicinity of the two parcels in question, 5 of them of improved property, and the balance unimproved, which he considered comparable, and which, in part at least, formed the basis for his estimated value of the two parcels in question. The location of these various plots is shown on plaintiff's exhibit 6, and photographic exhibits of some of them were also submitted.

Parcel A–44, adjoining parcel A–43 on the south and about 2800 feet north of Parcel A–57, was located on an unimproved plot 100x400, fronting on Western Avenue and adjoining in the rear the New York Central Railroad. It sold in November, 1944, for $1,000 or $10 a foot front.

Parcel A–45, unimproved, ½ mile north of A–57, and 100 feet away from A–43, had 175 feet on Western Highway and was 450 feet in depth, the rear adjoining the railroad. It was sold in January, 1940, for $2,000, or on the basis of $11 a foot front.

Parcel A–49, 1200 feet north of A–57 and about 1300 feet south of A–43, consisting of 7.86 acres, also unimproved, and with a frontage of 489 feet on Western Highway, and a depth of 555 feet back to the railroad, sold in June 1941 for $1500, or $3 a foot front, or about $200 an acre.

Parcel A–50, unimproved, 800 feet north of A–57 and 700 feet south of A–43, consisting of 4.48 acres, had 342 feet frontage on Western Highway, and a depth to the railroad of 535 feet. It sold in July 1939 for $2500, or about $7 a foot front, or a little over $500 an acre.

Parcel A–51, .34 of an acre, was located 550 feet north of A–57 and about 2,000 feet south of A–43. It fronted for 100 feet on Western Highway, and was 150 feet in depth. It had on it a one-family six-room stucco dwelling and a two-car garage, and sold for $6500 in December 1938.

Parcels A–53 and 49, unimproved, A–53 adjoining parcel A–57, A–49 being about 1200 feet north of it, and both parcels being joined by a neck of land about 150 feet in width and running along the railroad for about 1200 feet, had in it 15.98 acres. The two parcels had 850 feet road frontage on Western Highway and was sold in 1941 for $1500 or at the rate of a little less than $2 a foot front, or $100 an acre.

Parcel D–15 was located 2500 feet north of A–57 and about 550 feet from A–43, and consisted of .345 of an acre, 100 x 150. It had on it a three-room bungalow with bath and was situated on Mary Frances Street, 200 feet west of Western Highway. It sold in September 1942 for $1750 and is shown on plaintiff's Exhibit 2.

Parcel D–28 is located 3200 feet north of A–57, and about across the street from A–43, and had on it two houses. One of the houses on the plot which he said was every bit as desirable as the dwelling on A–43, had 125 feet frontage on Western Highway and was 200 feet in depth. The dwelling was a two-story Dutch Colonial frame house, with six rooms and bath, vapor heat, fireplace and double garage. It sold in February 1941 for $4500 and is shown on plaintiff's Exhibit 3. The other house was a one-family frame bungalow with bath, hot air heat, but needed decorating, cleaning and general repairs. It sold in January 1941 for $2200 and is shown on plaintiff's Exhibit 4.

Parcel D–29, approximately 3200 feet from A–57 and across the street from A–43, had a frontage of 75 feet on Western Highway and was 110 feet in depth. It had on it a one-family six-room frame dwelling with bath, pipeless furnace and garage, and sold in November 1941 for $3800. It is shown on plaintiff's Exhibit 5.

### Parcel A–43.

The purported owner of this was the defendant Irene Brugger. It has a frontage of 461.7 feet on Western Highway, a public road running from Tappan to Orangeburg, is 381.2 feet in depth on the southerly side, abuts the West Shore Railroad for 438 feet on the easterly side, and has a depth of 172.2 feet along the center line of a lane on the northerly side; and contained 2.72 acres.

There were two structures upon this plot, a stucco dwelling in which the owner's foreman lived, at a monthly rental of $30, and a factory operated by the defendant Hans C. Brugger. At the time I saw it, the dwelling and the larger part of the factory were still there. Plaintiff, however, in the meantime had built a road on the south side of the factory and residence, upon a fill about 20 feet high, and during the course of that work, a bulldozer had hit the roof of the factory, moving it about 6 inches, causing cracks in the wall, and throwing the building off center.

The dwelling was a two and one-half story, one-family, stucco building with a garage beneath it. It had eight rooms and a bath but no separate heating plant, its heat being piped from the factory. The factory was situated immediately in the rear of the dwelling, and there was some dispute as to whether the two buildings were connected.

One of defendant's experts called as to value, first divided the land into two parcels, two acres of which he assigned to the factory, and the balance to the dwelling. For access to the factory portion, he reserved from the highway frontage a 12 ft. right of way. He did not attempt to value the factory itself, but only the 2.72 acres of land and the dwelling. He testified that the .72 acres upon which the dwelling stood, which had a frontage of 450 feet along the highway, had a value of $15. per foot front or $6750, and the dwelling, cubed at 28¢ a foot, $9,001, less $1,350 depreciation, leaving as the sound value, and which he said was also the market value, $7,651; a total valuation for the residence with land of $14,401. The other two acres, which he assigned to the factory and which ran for 438 feet along the railroad, from which a siding was available, he testified was worth $2,500 per acre. There was, however, no siding there, and the owner had operated his factory upon these two acres without it since 1934. The witness further testified that, in valuing the factory site, he had in mind two sales at Teterboro, New Jersey, twelve miles away, one in September 1942 and the other in October 1943, each of which brought $2,500. an acre. His land value for the 2.72 of this parcel aggregated $11,750 or $4320 per acre. His total for land and dwelling, exclusive of the factory building, was $19,401. He did not have any knowledge of industrial values, and, therefore, did not appraise the factory.

Part of the factory was built as a garage in 1934 by the defendant Hans Brugger. He used it as such until 1935, after which he built an addition in the back 22 x 60, and converted the whole into a factory 91 feet long and 88 feet wide. At the time of taking, he manufactured

nipples for the plumbing supply trade, and had installed and used a number of machines therein for that purpose. He said he was well equipped, and that he had installed the machines from 1934 on, buying one machine after another as he needed them.

Defendant further stated that the Government actually took over his property on September 19, 1942, and that he moved out on December 24, 1942, at which time he had a contract with the Navy partly finished and the balance of the contract he had to give to a competitor to finish. There was but the one Diesel motor, which drove a large counter-shaft attached to the ceiling over each machine, and from that shaft belts came down to the machines. Defendant removed the belts but did not remove the shafting because he did not need it any more in his new place. Mr. Brugger, when recalled, also testified that all machines had concrete footings about 6 feet by 2 feet, and the Diesel engine foundation, he believed, was 5 or 6 feet deep; the others about one foot. When he vacated the factory, he removed all the machines, tools and one oil tank. He left the concrete foundations, troughs, oil tanks, floor covering and main counter-shaft which he could not use any more; to take them out would have cost more than it was worth. The countershaft could have been removed but he had no use for it; he would have to sell it for scrap because he did not use it in his new plant. He also left the electric wiring and the oil pipe lines; it would be of no use to remove them; they would only have scrap value afterwards; he could have removed them but it would not pay.

In October, 1942, the witness purchased five acres upon which he erected a new factory now in operation, and into which he moved the machines and tools from the old factory, 2500 feet to the north of Parcel 43, and which had 1,000 feet frontage on the Erie Railroad and 240 feet on the highway, and for which he paid $4500. He also purchased an extra lot contiguous to the last mentioned parcel, for which he paid $600. and which had about 1100 feet rail frontage. The land and buildings are shown on plaintiff's Exhibits 9, 10 and 11. The new location has no railroad siding.

A contractor called by defendant appraised the factory building only as of December 11, 1942. He stated that it consisted of two parts, one 66 x 90, and the other 90 feet on the long side, 24 feet on one end and 28 feet on the other, with a jog of 4 feet in the 90 ft. dimension. The construction was partly of 8 inch concrete blocks and partly of frame studding, with a covering of asbestos shingles on one side. The roof was of saw tooth construction, the hip being in three sections, each section approximately 22 x 90. One section of the roof was of a built-up asphalt and the other of composition shingle. Part of the flooring in the factory was concrete and the balance earth. One-half of the building had headroom approximately 4 feet greater than the other section.

He gave as his reproduction cost $12,909.96
Allowed depreciation of 1,241.55

Leaving a net value on December 11, 1942 of $11,668.41

which he also said was the market value of the building without the land. Other than as stated, he did not testify as to the amount which the building enhanced the value of the land. His figures of reproduction cost were based on new materials, and it would be reduced if he knew that it was in part made of secondhand material. That part of the material in the building was secondhand and that 90% of the building had been constructed by the claimant himself was shown to be the fact.

Another witness called by the defendant testified that he had been in the mechanical power transmission business since 1923, and went to the factory in September 1942. He stated that it was a suitable small plant operation furnished with conventional pipe cutting machines, plus special fixtures adaptable to defendant's business, plus tools, dies, three Diesel engines, 8 threading machines of varying sizes, a milling machine, lathe, shaper, 3 lathe beds, a 5-ton planer, a 2 ton extracter, a 3/4 ton disc cutting machine, a 2-ton punch press, two 1½-ton milling machines, a pipe reducing machine,

a pipe cutter, two drill presses and two cast iron circular saws, a ten horse power motor, a generator panel board, three compressors, a small punch press, two oil pumps, a high pressure pump, four oil tanks, three tool grinders, one abrasive saw, a cutting machine and an arc welder. He gave as the value of these various items the following:

| | |
|---|---:|
| 11 concrete foundations and troughs, supporting each Diesel engine and threading machine | $ 1,630.00 |
| Overhead transmission and supports for driving equipment, with hangers, shafting, couplings, collars, countershafts, belting, pulleys, motors, starting equipment and shifting forks | 3,319.05 |
| The value of this equipment in use, as against a dismantled plant—its market value as used in the conduct of the business | 36,355.00 |
| Piping from oil wells | 1,265.00 |
| Total | $42,569.05 |
| The value of the plant as a dead plant was | 27,369.05 |
| A loss of | $15,200.00 |

He did not know, however, what the claimant removed from the premises, but stated that all that he had appraised could be removed if the claimant desired; machines, pulleys, shafting and hangers could all be removed. The concrete foundations, troughs, supports, wiring, and wells for the oil made of concrete could not be removed. The overhead transmission had only a scrap value. It is obsolete today but is still usable.

He further stated that Mr. Brugger was not using the overhead transmission in his new plant; and that the machines which he used in the old plant were now being used in the new, which is not more or less efficient than was the old.

Plaintiff's witness testified that the fair market value of this parcel with improvements, including the dwelling and shop, was $12,000. He further stated that the dwelling, if not encumbered by the shop, was a nice dwelling, of desirable appearance, but it was encumbered by the factory in the rear which was built like a garage, with concrete block and frame siding. He itemized his appraisal of the parcel in question as follows:

| | |
|---|---:|
| Residence | $3,800.00 |
| Shop | 3,760.00 |
| Land | 4,500.00 |
| | $12,060.00 |

Another of plaintiff's witnesses was a building contractor who had examined what remained of the factory building in September 1944 and prepared an estimate of the cost of reproducing it. At the time of his examination, the lean to and a portion back of the present building had been demolished, but there was sufficient in the rear of the buildings so that he was able to figure out the size and make a thorough examination of the foundations. He testified that the factory building had been put up by men who were not mechanics, and that there were about 8382 cubic feet in it, which could be put up for about $1.25 a foot. After deducting 20% for wear and tear and 20% for functional depreciation, there was left a net value of $5,029.20. The wiring in the building had all been done by amateurs, and it was obvious that the building had not been designed by any engineer. The factory had three different types of floors and at different levels—a cement floor in two sections on the west side, and wood floor on the section east of the last named two, and the lean to had an earthen floor. The machines in the defendant's factory were all belt driven. At the date when plaintiff took possession plants generally had direct drives; that is, the motor was attached directly to the machine or was placed at the base of the machine; overhead shafting is seldom used today; such transmission was obsolete in March 1943; one can work more efficiently with direct drives.

The questions of value involved appear to be:

(1) Can there be any recovery for the value of the shafting, hangers, millwright-

ing, concrete foundations, oil piping and electric wiring not removed by the owner when he vacated possession, and if so, in what amount did they enhance the market value of the real property;

(2) can recovery be had for the difference in value between the machinery which was removed, as it was used in the factory at the time of the taking, and such value as a dead plant after it was removed therefrom; and

(3) what was the fair market value of the land and buildings at the time plaintiff took possession.

I shall discuss these questions in the order listed.

### (1)

◼ The defendant Brugger has testified that he could have removed all of these items, but it would not have paid to do so. In this he was corroborated by his witness Bernstein, who stated that everything in the factory could have been removed except concrete foundations, troughs and oil wells, and the electric wiring. It is obvious, therefore, that all of the property left, except the concrete work and electric wiring, was personal property. Matter of City of New York (Whitlock Avenue) 278 N.Y. 276-281, 16 N.E.2d 281; New York Life Ins. Co. v. Allison, 2 Cir., 107 F. 179-181, certiorari denied 181 U.S. 618, 21 S.Ct. 923, 45 L.Ed. 1030; United States v. Four Parcels of Land, D.C., 20 F.Supp. 306-307; Potomac Elec. Power Co. v. United States, 66 App.D.C. 77, 85 F.2d 243-248, certiorari denied 299 U.S. 565, 57 S.Ct. 27, 81 L.Ed. 416.

Being such there can be no recovery here for any taking of personalty; only the realty, with all buildings and improvements which are part of the realty, "except removable fixtures" are condemned. Petition, paragraphs II and VI. As noted by Judge Cardozo in Jackson v. State of New York, 213 N.Y. 34-36, 106 N.E. 758, L.R.A. 1915D, 492, Ann.Cas.1916C, 779, the appropriation has been "qualified when made;" by expressly excepting the personalty. See also United States ex rel. Tennessee Valley Authority v. Powelson, 319 U.S. 266-282, 283, 63 S.Ct. 1047, 87 L.Ed. 1390.

There is no testimony as to the amount which the concrete work and electric wiring left enhanced the value of the realty. Defendant's witness Bernstein testified that the value of the concrete was $1630. He stated no value as to the electric wiring. Plaintiff's witness testified that concrete foundations of the size testified to by Mr. Brugger, would require 23 yards of concrete, which in 1942 was worth $16. a cubic yard, or in all $368.

◼ I am very doubtful if these concrete foundations added anything to the market value of the realty. Whether they would be useful, or even desired by any other manufacturer is problematical, and certainly was not shown. The electric wiring, I think, was an asset enhancing the value. It was still in use when I viewed the property. I shall include the concrete foundation and wiring in the value hereafter fixed. See Matter of City of New York (Whitlock Avenue) 278 N.Y. 276 at page 281, 16 N.E. 2d 281; Potomac Elec. Power Co. v. United States, 66 App.D.C. 77, 85 F.2d 243-248, certiorari denied 299 U.S. 565, 57 S.Ct. 27, 81 L.Ed. 416.

### (2)

◼ Whether the difference between "going value" and the value of the machinery as a dead plant can be awarded depends largely on the evidence previously mentioned. Defendant did not sell the equipment but removed it to his new plant and is still using it. He was undoubtedly inconvenienced and put to expense in doing so. But that inconvenience is not compensable. Rate cases and those relating to condemnation of public utilities do not govern. The rule was discussed at length by Judge Crane in Banner Milling Co. v. State of New York, 240 N.Y. 533, at pages 539 and 540, 148 N.E. 668, 670, 41 A.L.R. 1019:

"There is a marked distinction between the instances where the state appropriates a public service corporation and all its business and good will as a going concern, intending to continue its operations as a public enterprise * * * and those instances where the state desires the land and not the business. Taking the land may cause the owner inconvenience and loss, by compelling him to remove his business to

some other place. Such loss, however, is not recognized as part of the damage or compensation which the state must pay for the land taken. * * * While it may be, as in this case, that removal from one place to another may cause some loss, yet the elements making up that loss are so highly speculative that the courts have not considered it an appropriation or damage for which the state should pay as commanded by the Constitution."

The proof submitted by defendants was aimed solely at the alleged depreciation in the value of the machinery removed, and not at any reduced value of the realty because of its removal.

■ As discussed above, personalty was not appropriated, but was expressly excepted from the taking. Any loss resulting from its removal was, therefore, not compensable. United States ex rel. Tennessee Valley Authority v. Powelson, 319 U.S. 266-283, 63 S.Ct. 1047, 87 L.Ed. 1390; United States v. General Motors Corp., 323 U.S. 373-379, 65 S.Ct. 357, 89 L.Ed. 311, 156 A.L.R. 390; Matter of People v. Johnson & Co. 219 App. Div. 285-288, 219 N.Y.S. 741-743, affirmed without opinion 245 N.Y. 627, 157 N.E. 885, certiorari denied 275 U.S. 571, 48 S. Ct. 159, 72 L.Ed. 432.

The point seems to have been expressly decided in the last cited case. There a water front property was condemned. An award was made for land, buildings, fixtures, certain additional material and auxiliary equipment. No award was made for personal property used or intended to be used in the operation of the business. Upon motion for confirmation of the commissioner's report, the Special Term decided that $117,526.68 should have been included as damage to this personalty rendered unavailable for further use by the necessary discontinuance of the business. The State appealed, contending that only real property was taken, which included only the land, building and fixtures. The owner sought to uphold the award and collect as damages the difference between what the personal property was worth on the day of condemnation and its value as removed from the plant. The salvage value of this was established by what it brought on an auction sale. The Appellate Division held the award erroneous, writing [219 App.Div. 285, 219 N.Y.S. 744]:

"The amount of the award * * * is the difference between the salvage value and the value of the items as in use. While this is a substantial item of damage, and would appear as a matter of first impression to be a proper basis for an award, yet the rule in this state * * * is against the payment for any personal property in a condemnation of land by the state which remains the property of the claimant, except in the instance of awards of consequential damage to land or actual appurtenances thereto which still remain the property of the owner. The rule is that the court is to determine whether the article taken is personal property or is a fixture. If it is a fixture, it is taken as part of the real estate. If it is not a fixture, it does not go with the land. * * *. For the enhancement of value due to the presence of fixtures in a factory or warehouse, the owner should be compensated in the land award. Jackson v. State of New York, 213 N.Y. 34, 103 N.E. 758, L.R.A.1915D, 492, Ann.Cas.1916D, 779.

### (3)

■ The fair market value of the land and buildings taken is the just compensation to be paid. Olson v. United States, 292 U.S. 246-254, 54 S.Ct. 704, 78 L.Ed. 1236; United States v. Miller, 317 U.S. 369-373, 63 S.Ct. 276, 87 L.Ed. 336, 147 A.L.R. 55. The burden of establishing the value is upon the defendants. Westchester Co. Park Com. v. United States, 2 Cir., 143 F.2d 688-692.

■ Where, as here, the land is improved by buildings, there must be added to the market value of the land, the further amount by which the buildings enhance that value. Devou v. City of Cincinnati, 6 Cir., 162 F. 633, certiorari denied 212 U.S. 577, 29 S.Ct. 685, 53 L.Ed. 658; Fain v. United States, 6 Cir., 145 F.2d 956-958; United States v. Becktold, 6 Cir., 129 F.2d 473-477; United States v. Certain Lands in Hempstead, D.C., 43 F.Supp. 418-423; United States v. 3.71 Acres, D.C., 50 F. Supp. 110-112.

■ There has really been no testimony offered by defendants bearing directly upon the subject of enhancement in market value. The obvious effort on their part was first to show the market value of the land, and then add to it the sound value (reproduction cost less depreciation) of the buildings; and in the case of the factory an additional amount for the difference between the value of the machinery in a going plant and in a dismantled one.

■ Their values, thus attempted to be established, cannot be accepted. And I think the land values placed upon the two parcels are far and beyond what is actually the fact. Thus, as to parcel A–57 upon which were located the three residences, and which contained but .59 of an acre, the aggregate given by defendants' witness was $1500; or nearly $3000 an acre. The owner had purchased the entire property for $2500 a little over eight months before the taking, and had expended in its improvement between $1400 and $1900. All sales in that vicinity, to which any reference was made, would not justify such a value. This parcel was not even located on a public highway.

I think, and I so find, that the market value of this parcel with its improvements on March 9, 1943, the date of taking, was as follows:

| | |
|---|---|
| Land, .59 of an acre | $ 500.00 |
| Building 4A | 3000.00 |
| Building 4B | 2000.00 |
| Building 4C | 1000.00 |
| Total | $6500.00 |

■ Parcel A–43 presents a more difficult problem. It had a frontage of 461.7 feet on Western Highway, a main thoroughfare in that town. Defendants' witness says that 450 feet of it, allocated to the .72 of an acre upon which the dwelling stood, was worth $15 per foot front. But he was unable, in fact did not attempt, to justify such value by any sales in that neighborhood. Such sales as were proven showed foot front values on Western Highway, all within a half mile, ranging from $2 to $11 a foot.

The same witness valued the remaining two acres of this parcel at $5000, basing his appraisal on two sales at Teterboro, New Jersey, twelve miles away, at $2500 an acre. There were no sales in the neighborhood to justify such a value. Mr. Brugger in October, 1942, purchased the site for his new factory, 2500 feet to the north, consisting of five acres, for which he paid $4500 or $900 an acre.

Thus, this witness placed an aggregate value on the 2.72 acres in this parcel of $11,750 or on the basis of $4320 an acre.

Here again, defendants sought to add to this extravagant land value the alleged sound value of the dwelling and factory upon it, not the value which they could be said to have enhanced the value of the land. The dwelling with its .72 acres of land was segregated from the factory with its 2 acres and a potential railroad siding, never built, never needed, and probably never would be built for the small factory upon the property.

The result was as follows:

| | | |
|---|---|---|
| Residence, sound value | $ 7,651.00 | |
| Land. 72 acre | 6,750.00 | $14,401.00 |
| Factory, sound value | $11,658.11 | |
| Land 2 acres | 5,000.00 | |
| | | $16,668.11 |
| Total | | $31,069.11 |
| And if the alleged depreciation of the machinery were to be added | | 15,200.00 |
| There remains a claim of | | $46,269.11 |

No comparable values of residence property in that vicinity were shown by defendants. Plaintiff proved one across the street in February 1941 (shown on Exhibit 3), which appeared to me equally as desirable as the residence in question, for $4500. And this one across the street did not have the none too pleasant factory close to it in the rear, which certainly did not add to the value of the residence considered separately, as it was by defendants' witness.

Plaintiff's witness has given his opinion of the values as follows:

| | |
|---|---|
| Residence | $ 3800.00 |
| Shop | 3760.00 |
| Land | 4500.00 |

$12,060.00

My award, based on what I think the fair market value of this parcel was on the day of taking, with the amounts by which the value of the land was enhanced by the improvements thereon, is as follows:

| | |
|---|---|
| Residence | $ 5,000.00 |
| Factory, with $500 for the wiring and concrete bases | 5,500.00 |
| Land (I have adopted the plaintiff's estimate which I think very liberal) | 4,500.00 |

$15,000.00

Judgment may be entered accordingly.